**ALYESKA PIPELINE SERVICE COMPANY, Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF ENVIRONMENTAL CONSERVATION, Appellee.**

No. S–12029.

Supreme Court of Alaska.

Oct. 13, 2006.

562

Svend A. Brandt–Erichsen, Heller Ehrman LLP, Seattle, Washington, for Appellant.

Steven E. Mulder, Assistant Attorney General, Anchorage, and David W. Márquez, Attorney General, Juneau, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

The Alaska Department of Environmental Conservation billed Alyeska Pipeline Service Co. for costs the department incurred defending against Alyeska's administrative challenge of an air quality control permit. Although federal law requires the department to recover all permit-related costs from industry, Alyeska argues that state law and due process do not allow the department to recover these costs directly from the appealing permit holder. Because we interpret former AS 46.14.240 as allowing the fee assessment, and because Alyeska has failed to demonstrate that its due process rights were violated, we affirm the decision of the superior court that affirmed the ruling of the department's deputy commissioner.

## II. FACTS AND PROCEEDINGS

The federal Clean Air Act (the Act) requires states to issue air quality control permits to major stationary sources of air pollution.[1] These permits "contain[ ], in a single, comprehensive set of documents, all [Act] requirements relevant to [a] particular polluting source."[2] In late 2003 the Alaska Department of Environmental Conservation issued two air quality control permits to Alyeska regulating its Valdez Marine Terminal. Alyeska administratively appealed several aspects of the permits. After some motion practice, Alyeska and the department apparently settled the consolidated appeals of the permits.

The current dispute concerns the department's attempt to recoup from Alyeska the costs the department incurred defending the two permits during Alyeska's administrative appeals.[3] Shortly after Alyeska initiated its appeals of the permits it received a department invoice for $8,073 for "permit administration fees." The department charges these permit administration fees to each permit applicant to recoup the direct costs of processing and administering the applicant's permit.[4] This invoice included charges for the time the department spent preparing its defense against Alyeska's appeals.

On April 30, 2004 Alyeska requested department review of these fees under the department's fee review procedure. Alyeska argued that neither Alaska law nor due process authorized the department to recover the department's defense costs directly from an appellant. The director of the department's Air Quality Division denied Alyeska's appeals on June 8, 2004. On Alyeska's motion for reconsideration, the department's deputy commissioner again denied the fee appeal. Alyeska appealed the decision to the superior court. On July 7, 2005 Superior Court Judge Joel H. Bolger upheld the decision of the deputy commissioner.

Through March 2005 Alyeska had contested a total of $34,556.39 in permit administration fees invoiced to it by the department in connection with Alyeska's appeals of the two air quality permits. Alyeska also anticipates being billed an additional $63,500 in fees and $2,151.27 in costs for work performed by the Department of Law on the permit appeals. The appeal now before us, however, concerns only the initial $8,073 invoice. As far as we can tell from the record, the department had not yet ruled on the propriety of the remaining invoices when this appeal was commenced. Furthermore, Alyeska could not have challenged the Department of Law's costs and fees because it had not yet been invoiced for them. Our decision today is not

1. *See* Clean Air Act § 502, 42 U.S.C. § 7661a (2000); *Public Citizen, Inc. v. EPA,* 343 F.3d 449, 453 (5th Cir.2003).

2. *Virginia v. Browner,* 80 F.3d 869, 873 (4th Cir.1996) (citing *Clean Air Act Amendments of 1990: Chafee–Baucus Statement of Senate Managers* (Conf.Rep. No. 952, 101st Cong., 2d Sess.), *reprinted in* 136 Cong. Rec. S16933, S16983 (daily ed. Oct. 27, 1990)). *Browner* characterizes a permit as "a source-specific bible for Clean Air Act compliance." *Id.*

3. As described in Part III, the legislature has since modified the statutory scheme allowing the department to recoup these costs.

4. *See* AS 46.14.240.

intended to address any charges other than the initial $8,073 invoice.

## III. DISCUSSION

### A. Standard of Review

When reviewing an agency decision that raises questions of statutory interpretation involving legislative intent, we review the questions independently, applying the substitution-of-judgment standard.[5] When deciding due process claims, we apply our independent judgment,[6] adopting the rule of law that is most persuasive in light of precedent, reason, and policy.[7]

Whether an agency action is a "regulation" requiring rulemaking under the Alaska Administrative Procedure Act is a question of law that does not involve agency expertise and that we therefore review applying our independent judgment.[8]

### B. Former AS 46.14.240 Allowed the Department To Recover the Costs of an Administrative Appeal.

Alyeska argues that the permitting system in place when it appealed the air quality permits did not authorize the department to recover its appeal costs directly from Alyeska.

The Clean Air Act sets national standards for the reduction of air pollution but allows states to largely control the process by which those standards are met.[9] Under Title V of the Act, participating states must issue to each stationary source permits setting out all the regulatory requirements to which the source is subject.[10] State permitting programs must meet specific requirements set out in the Act.[11] If a state fails to meet these requirements, the federal government may impose sanctions and even assume direct control over permitting in the state.[12]

The Act requires that industry, not state government, bear the costs of the permitting program.[13] Congress imposed the cost-recovery requirement because it determined that states were not adequately funding their clean air programs.[14] It also wished to "force sources of pollution to internalize the cost of such pollution."[15] Hence, the Act requires the EPA to promulgate regulations mandating that state permitting programs include

[a] requirement under State or local law or interstate compact that the owner or operator of all sources subject to the requirement to obtain a permit under this subchapter pay an annual fee, or the equivalent over some other period, sufficient to cover all reasonable (direct and indirect) costs required to develop and administer the permit program requirements of this subchapter, ... including the reasonable costs of—

(i) reviewing and acting upon any appli-

---

5. *State v. Dupier,* 118 P.3d 1039, 1044 (Alaska 2005).

6. *Wendell C. II v. State, OCS,* 118 P.3d 1, 3 (Alaska 2005).

7. *Paxton v. Gavlak,* 100 P.3d 7, 10 (Alaska 2004).

8. *Alaska Ctr. for the Env't v. State,* 80 P.3d 231, 243 (Alaska 2003).

9. *See Commonwealth of Va. v. EPA,* 108 F.3d 1397, 1410 (D.C.Cir.1997) ("The states are responsible in the first instance for meeting the national ambient standards through state-designed plans that provide for attainment, maintenance, and enforcement of the national standards in each air quality control region. Thus, each state determines an emission reduction program for its nonattainment areas, subject to EPA approval, within deadlines imposed by Congress." (internal quotation marks omitted)).

10. *See N.Y. Pub. Interest Research Group, Inc. v. Johnson,* 427 F.3d 172, 176 (2d Cir.2005).

11. *Id.*

12. Clean Air Act § 502, 42 U.S.C. § 7661a(d) (2000).

13. 42 U.S.C. § 7661a(b)(3).

14. S.Rep. No. 101–228, at 348 (1989), *as reprinted in* 1990 U.S.C.C.A.N. 3385, 3731 ("Throughout the 20–year history of the current Clean Air Act, inadequate State and local agency resources have increasingly hampered pollution control efforts.").

15. *Id.* at 351, *as reprinted in* 1990 U.S.C.C.A.N. 3385, 3734.

cation for such a permit.... [16]

Alaska has created a permitting program under the Act.[17] Alaska recoups the costs of its permitting program from industry through two types of fees: "permit administration fees" and "emission fees."[18] Although the Alaska legislature has since amended the state statute authorizing permit administration fees,[19] the statute at the time of Alyeska's administrative appeals defined permit administration fees in relevant part as:

fees assessed to recover costs incurred by the department and other state or local governmental agencies, to the extent required under 42 U.S.C. 7661a(b)(3)(A) and federal regulations implementing that provision, for the following services to a specific stationary source that are performed in order to implement the permit program established under this chapter:

. . .

(3) receiving, reviewing, preparing, processing, and issuing permits, permit amendments, modifications, reopenings,

renewals and revocations, and reissuance.... [20]

In its regulations in force at the time of the controversy, the department set the permit administration fee rate at $78 per hour of staff time.[21] The regulations did not elaborate on what specific department services were chargeable as permit administration fees.[22]

All stationary emissions sources must also pay "emission fees," which former AS 46.14.250(h) defined as

fees assessed to recover costs incurred by the department and other state or local governmental agencies, to the extent required under 42 U.S.C. 7661a(b)(3)(A) and federal regulations implementing that provision, for execution of the permit program established under this chapter that are generally not associated with service provided to a specific facility ...; the costs may include rent, utilities, permit program management, administrative and accounting services, and other costs as identified by the department in regulations.[23]

**16.** 42 U.S.C. § 7661a(b)(3)(A).

**17.** *See* AS 46.14.010 *et seq.*

**18.** AS 46.14.240–.250.

**19.** *See* AS 46.14.240. AS 46.14.240 now provides that the department shall establish permit administration fees in accordance with AS 37.10.050–.058. Those provisions require agencies either to set "fixed fees" for "standard designated regulatory services" or to reach a "negotiated service agreement" with the regulated party. AS 37.10.052. Under current department regulations, an adjudicatory hearing regarding a permit decision is a "designated regulatory service" subject to an hourly fee. 18 Alaska Administrative Code (AAC) 50.400(m) (2006 Supp.).

**20.** Former AS 46.14.240(c). The other "services" listed in former AS 46.14.240(c) are:
(1) providing preapplication consultation, assistance, and completeness review of applications for a permit, permit amendment, permit modification, or renewal, except as provided in (d) of this section;
(2) reviewing or assisting in preparation of stationary source specific permit support documents, including on-site evaluations, except as provided in (d) of this section;
. . .
(4) preparing general operating permits under AS 46.14.210; however, costs must be allocat-

ed on an equitable basis to each stationary source covered by the general operating permit;
(5) performing stationary source inspections and compliance evaluations;
(6) reviewing, compiling, and reporting stationary source specific emission, ambient monitoring, or process measurement data;
(7) preparing, evaluating, or processing plans or documents to obtain stationary source compliance or rectify noncompliance with permit terms and conditions, but not including any enforcement actions; and
(8) assessing and collecting delinquent permit administration fees and emission fees.
The department concedes that it cannot collect the fees unless it is authorized to do so by former AS 46.14.240(c)(1)-(8) and does not argue that any subsection other than (3) might be applicable.

**21.** Former 18 AAC 50.400 (2004). The current version of 18 AAC 50.400 imposes a variable hourly rate based upon the salary and benefits of the employees working on the permit, plus costs. 18 AAC 50.400(m). It also sets fixed annual fees for many of the regulatory services provided by the department. 18 AAC 50.400(a)-(*l* ).

**22.** Former 18 AAC 50.400 (2004).

**23.** Former AS 46.14.250(h) (2003).

Unlike the permit administration fees, the emission fees are dispersed among all permit holders on the basis of each facility's "estimated assessable emissions." [24]

Alyeska argues that under the version of AS 46.14.240(c) that applies in this case the department was not authorized to recover the costs of defending an administrative appeal through permit administration fees. It suggests that the department could have more appropriately recovered these costs through emission fees.

In interpreting a statute we "consider its language, its purpose, and its legislative history, in an attempt to give effect to the legislature's intent, with due regard for the meaning the statutory language conveys to others." [25] In considering legislative history we follow the maxim that "the plainer the language, the more convincing contrary legislative history must be." [26]

To prevail, Alyeska must explain why the plain text of the statute should not govern the outcome of this case. Former AS 46.14.240(c)(3) specifically allowed the department to recoup, through permit administration fees, the costs of "reviewing ... permits." An administrative appeal of permit terms would seem to fall squarely within the ambit of "reviewing" the permit.

Alyeska advances several arguments against this plain reading of the statute. It first contends that the term "reviewing," read in the overall context of "receiving, reviewing, preparing, processing, and issuing" permits, cannot include adjudication of a permit because "reviewing" is listed before "issuing." [27] It argues that the order of the terms suggests that each term should be limited chronologically to a particular stage in the process of approving a permit application. Hence, "reviewing" a permit by the department must be completed before "preparing, processing, and issuing" can occur. [28]

It is not obvious that the terms are in chronological order. Although it is true, for example, that "receiving" a permit application must precede "issuing" the permit, it is less clear that "preparing" must precede "processing" or must follow "reviewing." But even assuming that the terms are listed in the order in which the agency generally starts a particular stage of the permitting process, it does not follow that the legislature intended to specify a rigid sequence that prevented one activity from beginning before a previous one ended. "[R]eviewing," "preparing," and "processing" are all functions that one would expect might continue throughout the permitting process. Nothing in the statute suggests that these functions necessarily end upon "issuing" the permit. Thus, "reviewing" is best interpreted as referring to not only the department's initial review when it first receives a permit application, but also its review at each point when it reviews or is asked to review its work; this logically includes administrative hearings.

Alyeska next argues that an administrative appeal cannot be considered "reviewing" by the department because once the appeal process is initiated, the department becomes an adverse party and is therefore defending rather than reviewing its work. But as we have noted, the purpose of an administrative review process is to allow an agency "to correct its own errors so as to moot judicial controversies." [29] The department's more adversarial role in an administrative appeal serves the ultimate goal of ensuring that the permit is legally sound and error-free. In other words, by defending its permitting decisions during an administrative proceeding, the department is "reviewing" the permit, even though it is acting in an adversarial capacity.

---

**24.** AS 46.14.250(b).

**25.** *In re Estate of Maldonado,* 117 P.3d 720, 725 (Alaska 2005) (quoting *Alyeska Pipeline Serv. Co. v. DeShong,* 77 P.3d 1227, 1234 (Alaska 2003) (internal quotation marks omitted)).

**26.** *State v. Public Safety Employees Ass'n,* 93 P.3d 409, 415 (Alaska 2004) (quoting *Tesoro Petroleum Corp. v. State,* 42 P.3d 531, 537 (Alaska 2002)).

**27.** *See* former AS 46.14.240(c)(3).

**28.** *See id.*

**29.** *Voigt v. Snowden,* 923 P.2d 778, 781 (Alaska 1996) (citations omitted).

Even if we were to conclude that the text of former AS 46.14.240(c), read in isolation, is ambiguous on the question of whether the department's defense costs are recoverable, any such ambiguity disappears when the statute is read in context of federal law. Alaska created its current permitting program in response to a federal mandate.[30] The Clean Air Act requires that states recoup from industry "all reasonable (direct and indirect) costs required to develop and administer the permit program requirements."[31] Because 42 U.S.C. § 7661a(b)(6) requires states to provide applicants with procedures for "expeditious review of permit actions,"[32] the costs of such review must be among those "required to ... administer the permit program requirements." States are therefore required to recover appeal costs under the Act. We note that the EPA reached the same conclusion in a policy guidance issued in 1993.[33]

In its 1993 act creating Alaska's permitting program, the legislature identified one of the act's purposes as "retain[ing] federal approval of the state's air quality control program in order to ensure the continued receipt of federal highway and air pollution control money."[34] This statement of purpose obliges us to interpret any ambiguity in the statute in a way that complies with federal requirements if it is reasonable to do so. Without specific legislative direction or history to the contrary, it is implausible to think that the legislature wished to depart from the clear requirements of the Act regarding cost recovery. Hence, we must interpret former AS 46.14.240(c) as allowing recovery of appeal costs.

Alyeska suggests that an interpretation of former AS 46.14.240(c) that excludes appeal costs need not violate federal law because the department could recoup those costs via emission fees. As noted above, emission fees cover costs that are "generally not associated with service provided to a specific facility," such as "rent, utilities, permit program management, administrative and accounting services, and other costs as identified by the department in regulations."[35] Because federal law does not require that each permit holder pay its own costs, but only that the state recover the total costs of administering the permit program from permit holders as a group,[36] the emission fees provision could be viewed as a catch-all provision intended to recover all the costs of the permitting program that were not within the scope of the eight enumerated services set out in former AS 46.14.240(c). Alyeska points out that, unlike the provision authorizing permit administration fees, the emission fee provision allows the department to specify through regulations what costs can be recovered through emission fees. Alyeska argues that the department could have placed administrative appeal costs into this category through regulations.

We are not convinced that the statutory definition of emission fees is properly understood as including appeal costs. Unlike the department's rent or utilities costs, the ad-

**30.** *See* ch. 74, § 1, SLA 1993; Clean Air Act § 502, 42 U.S.C. § 7661a(d) (2000).

**31.** 42 U.S.C. § 7661a(b)(3).

**32.** 42 U.S.C. § 7661a(b)(6) requires states to provide

[a]dequate, streamlined, and reasonable procedures for ... expeditious review of permit actions, including applications, renewals, or revisions, and including an opportunity for judicial review in State court of the final permit action by the applicant.

**33.** EPA, Questions and Answers on the Requirements of Operating Permits Program Regulations at 9–2 (July 7, 1993), *available at* http://www.epa.gov/Region7/ programs/artd/air/title5/t5memos/bbrdq & a1.pdf. The department suggests

that in interpreting former AS 46.14.240 we should defer to the EPA guidance. But because the guidance was issued after the Alaska legislature passed former AS 46.14.240 it does not shed any light on legislative intent. *Id.;* ch. 74, § 1, SLA 1993 (enacted June 25, 1993). The guidance nonetheless remains relevant as persuasive authority regarding the proper interpretation of 42 U.S.C. § 7661a.

**34.** Ch. 74, § 1, SLA 1993. As noted above, noncompliance with the Clean Air Act's requirements can result in sanctions, such as loss of federal funding and even federal takeover of pollution control within the state. 42 U.S.C. § 7661a(d).

**35.** Former AS 46.14.250(h).

**36.** *See* 42 U.S.C. § 7661a.

ministrative appeal costs of defending a particular permitting decision for a particular facility are directly associated with a "service provided to a specific facility." An attempt by the department to recover its appeal costs as emission fees would appear to violate former AS 46.14.250(h)'s requirement that emission fees cover costs that are "generally not associated with service provided to a specific facility." By limiting emission fees to indirect costs—those "not associated with service provided to a specific facility"—the legislature seems to have viewed permit administration fees as the proper vehicle for collecting costs that can be traced to a specific permit holder.

We also note that the legislative history of former AS 46.14.240(c) indicates a desire to require individual permit holders to internalize the costs of their own permits. The statute was drafted by a legislative working committee comprised of representatives from various stakeholders in the federal Clean Air Act, including the oil and gas industry.[37] The committee explained that the bifurcated fee system was "developed on the policy premise that a cost generator is to be the cost bearer." [38] At a committee meeting, a representative of the oil and gas industry elaborated on this premise: "Those people who have very complex permits, that have controversial permits, who don't do a good job on their permits, [should not] get a free ride, and everybody else pays for it." [39] The committee's understanding was that emission fees should be limited to recovering "the costs of performing those functions of the permit program that benefit or assist all permit holders through execution of a state permit program." [40] These statements reinforce our conclusion that the legislature intended administrative appeal costs to be recovered through permit administration fees and not through emission fees.

Because the legislature created no other fee provision that can reasonably be interpreted as allowing the recovery of appeal costs, an interpretation of subsection .240(c) that excluded such costs would seem to require a conclusion that the legislature did not intend to comply with the Act's mandate to recoup appeal costs. We are unwilling to draw such a conclusion without evidence suggesting that the drafters intended such a result.

We therefore conclude that former AS 46.14.240(c) allowed the department to recover the costs of administrative appeals through permit administration fees.

## C. Recovery of Appeal Costs Does Not Violate Alyeska's Due Process Rights.

Alyeska also argues that the department's interpretation of former AS 46.14.240(c) violated Alyeska's due process rights. It contends that the department's interpretation impermissibly impeded the ability of permit holders to seek review of flaws in their permits by forcing them to bear the department's defense costs even if their complaints were valid. It also argues that its due process rights were violated because it was not given proper notice that it would have to pay the department's appeal costs and because the department's adjudication process was biased against Alyeska.

### 1. The department's recovery of its appeal costs from Alyeska did not unconstitutionally impede Alyeska from seeking review of its permit.

■ Alyeska's first argument is that the department's interpretation of the fee administration provision unjustifiably impedes its access to justice, and therefore fails the balancing test set out in *Mathews v. El-*

**37.** Other participants included, among others, environmental groups, the Department of Defense, and the state. Letter from the Air Quality Legislative Working Comm. to John Sandor, Comm'r, Alaska Dep't of Envtl. Conservation, attach. # 4 at 6 (Dec. 28, 1992).

**38.** Letter from the Air Quality Legislative Working Comm. to John Sandor, Comm'r, Alaska

Dep't of Envtl. Conservation, attach. # 4 at 6 (Dec. 28, 1992).

**39.** Transcript of Air Quality Legislative Working Comm. Meeting # 6 at 58 (Nov. 17, 1992).

**40.** Letter, *supra* note 38, attach. # 4 at 7.

*dridge*[41] and *Midgett v. Cook Inlet Pre–Trial Facility*.[42] Per those cases, the court must weigh three factors: (1) "the private interest affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the government's interest, including the fiscal and administrative burdens that additional or substitute procedural requirements would entail." [43]

The parties disagree regarding all three factors. But even if we assume that the first and third factors favor Alyeska, its due process claim nevertheless fails because Alyeska has not shown that the fees created any risk of an erroneous deprivation in this case.

Alyeska contends that shifting the department's appeal costs onto the permit holder creates a risk of erroneous deprivation because it gives the department an "unfair advantage" by forcing "Alyeska and other permit holders to consider forgoing, limiting, or abandoning legitimate claims." Alyeska also suggests that the department's cost-shifting "removes the normal incentives and constraints that influence assessment of the strengths and weaknesses of [the department's] case, such as whether to press on and defend a provision with little legal basis and minimal environmental return."

Alyeska cannot claim that its due process rights were violated merely because it was forced to "consider" forgoing some or all of its claims. In *Varilek v. City of Houston* we held in a zoning dispute that a landowner's due process right of access to the courts would be violated by a mandatory administrative appeal fee of $200 only if the landowner could demonstrate that he was unable to pay the fee.[44] *Varilek* recognized the principle that a party claiming violation of its right of access to the courts must demonstrate that it was itself placed at risk of an erroneous deprivation.[45] Even in due process cases in which our holding had potentially broad implications for a class of litigants (e.g., parolees, defendants in license revocation hearings), the parties seeking relief had suffered actual deprivations of their rights.[46]

In this case, Alyeska pursued its claims vigorously and admits that it reached settlement with the department on contested elements of the permits. It identifies no specific harm that it suffered during that litigation. It does not suggest, for example, that the department coerced it into an unfavorable settlement under threat of exorbitant permit administration fees. Rather, it speculates about the incentives created by the provision. Because Alyeska has not demonstrated that it was in any way denied access to agency or judicial review, its due process argument fails.[47]

Alyeska argues that *Malvo v. J.C. Penney Co.* requires a contrary result. In that case we held that the superior court abused its discretion by awarding full attorney's fees to the prevailing party.[48] We reasoned that the

---

41. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

42. *Midgett v. Cook Inlet Pre–Trial Facility*, 53 P.3d 1105, 1111 (Alaska 2002).

43. *Id.*

44. *Varilek v. City of Houston*, 104 P.3d 849, 853–55 (Alaska 2004) (remanding to superior court to determine whether landowner was indigent).

45. *See id.*

46. *See Javed v. Dep't of Pub. Safety, Div. of Motor Vehicles*, 921 P.2d 620, 625 (Alaska 1996) (holding that statute prohibiting accused in license revocation hearing from introducing evidence that he was not driving at time of arrest violated due process as applied to accused and others like him); *Bush v. Reid*, 516 P.2d 1215, 1215–20 (Alaska 1973) (holding that statute barring parolees from bringing civil suits violated parolee's due process rights by prohibiting him from bringing personal injury action).

47. We acknowledge the possibility that an administrative procedure could alter the litigating position of a class of litigants so drastically as to render the procedure facially invalid. But in this case, Alyeska has not demonstrated that its due process right of access to the courts was harmed, let alone that "no set of circumstances exists under which the [provision] would be valid" or that the provision does not have a "plainly legitimate sweep." *See Treacy v. Municipality of Anchorage*, 91 P.3d 252, 260 n. 14 (Alaska 2004).

48. *Malvo v. J.C. Penney Co.*, 512 P.2d 575, 587 (Alaska 1973).

prevailing party should not "automatically" be awarded full attorney's fees without considering whether those fees are just.[49] Although we suggested that due process might be implicated by an "automatic" award of full attorney's fees, we declined to decide the case on due process grounds, holding instead that the superior court's decision was manifestly unreasonable under Alaska Civil Rule 82 and, thus, an abuse of discretion.[50]

*Malvo* was not decided on due process grounds and therefore its discussion of the due process implications of automatic fee shifting is dictum. Furthermore, unlike *Malvo*, Alyeska was not required to pay the full amount of the department's fees regardless of whether those fees were reasonable. The applicable regulations give permit holders the right to dispute a "fee or computation" through an administrative appeal.[51] Although Alyeska challenged only the permissibility of the fees, it was free under this provision to challenge their reasonableness as well. It did not do so. More broadly, in *Malvo*, as in *Varilek*, we were principally concerned about the effect of a financial barrier in the specific circumstances of that case. We noted in *Malvo* that "a cost requirement, *valid on its face,* may offend due process because it operates to foreclose a particular party's opportunity to be heard." [52] We left open the possibility that an award of full fees could be justified in some cases.[53] Because Alyeska has not demonstrated that the fees assessed by the department were unreasonable or detrimental to Alyeska's litigation efforts, *Malvo's* dictum is inapposite.

### 2. Alyeska was given constitutionally sufficient notice of the fees.

█ Neither former AS 46.14.240 nor the implementing regulations in force at the time specifically identified appeal costs as recoverable through permit administration fees.[54] Alyeska argues that, given this silence, the department's failure to notify it of the cost-shifting policy violated due process. It argues that "later process, such as this appeal," cannot remedy the violation because had it known about the charges it might have decided to file more limited appeals, or no appeal at all.

█ In *Amerada Hess Pipeline Corp. v. Alaska Public Utilities Commission,* the Alaska Public Utilities Commission (APUC) charged pipeline owners nearly two million dollars in costs and attorney's fees for a tariff investigation.[55] The commission was statutorily authorized to assess such charges, but the owners claimed that a vague statute and the lack of regulations interpreting the statute failed to give them notice of the possibility of such fees.[56] We ruled in favor of the APUC, holding that "[t]he adequacy of process does not depend on the advance adoption of standards. Rather, we must look to the entire set of safeguards provided in the particular proceeding." [57] We continued:

> Even assuming, arguendo, that the owners had no notice of the APUC's cost allocation policy during most of the six years in which the costs were expended, they received notice and an opportunity to object to the APUC's policy and decision before the allocation order became final.[58]

Like the owners in *Amerada Hess*, Alyeska began receiving fee invoices and was given an opportunity to contest them relatively soon after it initiated its appeals. Generally speaking, the notice requirement in due process is associated with the requirement that there be a meaningful opportunity to be heard. As we have explained: "[t]he crux of

49. *Id.* at 586–87.

50. *Id.* at 587.

51. 18 AAC 15.190.

52. *Malvo,* 512 P.2d at 587 (emphasis added) (quoting *Boddie v. Connecticut,* 401 U.S. 371, 380, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971)).

53. *Id.* at 588.

54. *See* former AS 46.14.240; former 18 AAC 50.400 (2003).

55. *Amerada Hess Pipeline Corp. v. Alaska Pub. Utils. Comm'n,* 711 P.2d 1170, 1174–75 (Alaska 1986).

56. *Id.* at 1175, 1179.

57. *Id.* at 1178.

58. *Id.* at 1179.

due process is opportunity to be heard and the right to adequately represent one's interests. Adequate notice is the common vehicle by which these rights are guaranteed."[59] Alyeska does not contend that it was denied an adequate opportunity to argue that the department's fees were impermissible or unreasonable.

It is true that, unlike the owners in *Amerada Hess*, Alyeska initiated the cost-producing action. If it had been aware of the department's policy, Alyeska could have exercised control over the costs by limiting or forgoing its appeals. This fact distinguishes this case somewhat from *Amerada Hess*, in which "lack of notice of the APUC's policy could not have harmed the owners" because they did not have any control over the investigation.[60] But any due process violation that may have resulted from Alyeska's inability to make a fully informed choice whether to appeal is demonstrably harmless. Alyeska commenced its appeals of the two permits on October 24, 2003 and December 24, 2003 respectively. Alyeska first received notice that it would be assessed some fees when, several months later, it received the April 13, 2004 invoice for $8,073. Although it could have withdrawn or limited its appeals at that point, Alyeska continued to pursue its appeals for almost a year after it knew the department would charge its fees to Alyeska. Also, Alyeska mentions in its reply brief that the air quality permits contained terms that "were not only in error, but that the company could not meet." Indeed, after reviewing drafts of the permits one of Alyeska's engineers warned the department that Alyeska would have "little choice" but to pursue an appeal if the permits were issued without modification. Given Alyeska's continued pursuit of the appeals after receiving notice of the fees and the apparently vital interests at

stake for Alyeska, we may assume that Alyeska would have prosecuted the permit appeals regardless of whether it was aware of its potential liability for fees. Any due process violation resulting from its inability to make a fully informed decision whether to appeal is therefore harmless.

In addition, Alyeska should have realized that the department might recoup its appeal costs. Alyeska argues that this case is distinguishable from *Amerada Hess* because the owners there had some notice of the possibility of a fee assessment while Alyeska had no notice at all. Alyeska points out that AS 46.14.240(c) does not directly state that the department may recover the costs of administrative appeals. But for the reasons discussed in Part III.B above, a careful reading of AS 46.14.240(c)—particularly in light of the Clean Air Act's cost-recovery requirements—should have alerted Alyeska to the possibility that it would have to pay the department's costs if Alyeska appealed, just as it has been required to pay all other costs related to its permits. Thus, Alyeska's position at the beginning of this case was little different than that of the pipeline owners in *Amerada Hess*. Both had at least constructive notice of the possibility that they would be forced to pay the state's costs.

3. **The department's fee review provisions do not create an unconstitutional conflict of interest.**

Alyeska asserts that the regulations establishing the procedure for reviewing fees are constitutionally flawed because they create impermissible conflicts of interest. Under 18 AAC 15.190, the director of the department's Air Quality Division decides fee disputes.[61] Alyeska argues that the director

---

59. *Matanuska Maid, Inc. v. State*, 620 P.2d 182, 192–93 (Alaska 1980) (citations omitted).

60. *Amerada Hess*, 711 P.2d at 1179.

61. 18 AAC 15.190 states:
Fee review.
(a) An applicant for a permit or approval who is authorized by a provision of this title to seek a review of a fee decision of the department under this section may, within 30 days of receipt of the fee invoice, make a written request

that the director of the division issuing the invoice review the matter. The applicant need not pay the disputed fee until the director issues a final decision under (b) of this section, and the department will not charge interest while the director considers the request for fee review.
(b) A request for fee review must be accompanied by a written discussion that sets out the reasons why the fee or computation is disputed and how it should be adjusted. The director of the department division issuing the invoice

cannot impartially decide whether the fees are permissible because he has a vested interest in ensuring that the department complies with the requirements of federal law, and in ensuring the financial health of the department. Alyeska posits that the director has a second conflict of interest because in substantive (i.e., non-fee-related) permit appeals, he directs the department's defense. Alyeska concludes that the director cannot impartially review the department's fee assessments because the director is largely responsible for incurring those fees in the first place.

Alyeska's argument that the director has a conflict of interest because he is charged with ensuring compliance with federal law and meeting state budget requirements is unpersuasive. Officials employed by administrative agencies may decide administrative appeals without violating due process so long as adequate procedural safeguards exist to protect the rights of the appellant. As we noted in *Amerada Hess*, "[m]ost courts ... accept that the merger of investigative and executive responsibilities with adjudication does not violate federal due process if institutional safeguards exist against the abuse of unchecked administrative discretion." [62] In this case, the requirement of a written decision and the right to superior court review sufficiently protect the litigant from abuse.[63]

Alyeska's argument that the appeal process violates due process because the director is the principal generator of the fees he is called upon to adjudicate also fails. As the department points out, Alyeska is challenging not the reasonableness of the department's fees but its statutory and constitutional authority to charge them at all. There is no reason to think that the director would be unable to consider this argument impartially. Similarly, Alyeska's contention that superior court review is insufficient because of the

director's ability to shape the record is unpersuasive because there are no factual issues in dispute in this appeal.

## D. The Department Was Not Required To Adopt a Regulation Before It Could Recoup Its Costs.

■ Alyeska argues that the Alaska Administrative Procedure Act prohibited the department from billing Alyeska for appeal costs because the department had not adopted a regulation allowing recovery of such costs.

The Alaska Administrative Procedure Act defines a "regulation" as:

> every rule, regulation, order, or standard of general application ... adopted by a state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure, except one that relates only to the internal management of a state agency; ... "regulation" includes "manuals," "policies," "instructions," "guides to enforcement," "interpretative bulletins," "interpretations," and the like, that have the effect of rules, orders, regulations, or standards of general application, and this and similar phraseology may not be used to avoid or circumvent this chapter; whether a regulation, regardless of name, is covered by this chapter depends in part on whether it affects the public or is used by the agency in dealing with the public.[64]

Regulations as defined by this provision must be adopted pursuant to the notice and public comment requirements of the act.[65]

We have held that the term "regulation" should be understood "expansive[ly]." [66] An indication of a regulation is that it "implements, interprets, or makes specific the law enforced or administered by the state

---

shall issue a written decision on the disputed invoice within 30 days after receiving the request for fee review. A decision made under this subsection is the final agency decision. A person aggrieved by that decision may appeal it to the superior court in accordance with the Alaska Rules of Appellate Procedure.

**62.** *Amerada Hess*, 711 P.2d at 1180.

**63.** *See* 18 AAC 15.190.

**64.** AS 44.62.640(a)(3).

**65.** *See* AS 44.62.190–.215.

**66.** *Messerli v. Dep't of Natural Res., State*, 768 P.2d 1112, 1117 (Alaska 1989), *abrogated on other grounds by Olson v. State, Dep't of Natural Res.*, 799 P.2d 289, 292–93 (Alaska 1990).

agency." [67] Alyeska argues that under this expansive view, the department's policy of recovering appeal costs is a "regulation" subject to the notice and public comment provisions of the Alaska Administrative Procedure Act.

Although the definition of "regulation" is broad, it does not encompass every routine, predictable interpretation of a statute by an agency. Nearly every agency action is based, implicitly or explicitly, on an interpretation of a statute or regulation authorizing it to act. A requirement that each such interpretation be preceded by rulemaking would result in complete ossification of the regulatory state. We recognized as much in *Alaska Center for the Environment v. State*, in which we faced the question whether an agency's interpretation of a regulation defining "major energy facility" itself constituted a "regulation" subject to the requirements of the Administrative Procedure Act. [68] We held that the agency's interpretation was not a "regulation" because it was merely "a common sense interpretation of the regulation's applicability." [69] We noted that "[t]he Division's interpretation 'was not an addition to a regulation involving requirements of substance,'" but rather, an "'interpretation of the regulation according to its own terms.'" [70] We reaffirm this principle today. Although the Administrative Procedure Act may require rulemaking in cases in which an agency's interpretation of a statute is expansive or unforeseeable, or in cases in which an agency alters its previous interpretation of a statute, obvious, commonsense interpretations of statutes do not require rulemaking.

The department's interpretation of former AS 46.14.240(c) was such a commonsense interpretation and was therefore not subject to the Administrative Procedure Act's notice and comment requirements. The department was therefore not required to issue regulations before assessing Alyeska for the fees.

## IV. CONCLUSION

We consequently AFFIRM the decision of the superior court affirming the ruling of the department's deputy commissioner.

**67.** *Kenai Peninsula Fisherman's Coop. Ass'n v. State*, 628 P.2d 897, 905 (Alaska 1981).

**68.** *Alaska Ctr. for the Env't v. State*, 80 P.3d 231, 243–44 (Alaska 2003).

**69.** *Id.* at 244.

**70.** *Id.* (quoting *Usibelli Coal Mine, Inc. v. State, Dep't of Natural Res.*, 921 P.2d 1134, 1149 n. 24 (Alaska 1996)).